THE STATE OF NEVADA, on Relation of its DEPARTMENT OF TRANSPORTATION, Appellant/Cross-Respondent, *v.* KENNETH J. BARSY; SHELBY R. SEILER; YOUNG ELECTRIC SIGN COMPANY, a Utah Corporation; GOLDEN WEST MECHANICAL, INC., a Nevada Corporation; WYATT, TIEDER, KILLIAN and HOFFER, a Virginia Partnership; SHARON L. BARSY; LAND TITLE COMPANY, INC., a Nevada Corporation; COLDWELL BANKER COMMERCIAL REAL ESTATE GROUP, INC., a Delaware Corporation; NEVADA TITLE COMPANY, a Nevada Corporation; VALLEY BANK OF NEVADA, a Nevada Corporation; UNITED STATES OF AMERICA ex rel. its DEPARTMENT OF TREASURY and INTERNAL REVENUE SERVICE; CLARK COUNTY TREASURER; CLARK COUNTY SANITATION DISTRICT NO. 1; COUNTY OF CLARK, a Political Subdivision of the STATE OF NEVADA; and all Other Persons Unknown Claiming any Right, Title, Estate, Lien or Interest in the Real Property Described in the Complaint, Respondents/Cross-Appellants.

No. 26739

June 17, 1997
941 P.2d 971

*Frankie Sue Del Papa,* Attorney General and *Leslie A. Nielsen,* Deputy Attorney General, Carson City, for Appellant/Cross-Respondent.

*Kermitt L. Waters,* Las Vegas, for Respondents/Cross-Appellants.

## OPINION

*Per Curiam:*

Appellant State of Nevada, on relation of its Department of Transportation (NDOT), initiated an eminent domain action to condemn a two-acre parcel of land owned by respondent Kenneth Barsy (Barsy). Barsy filed a counterclaim, seeking lost rental income due to NDOT's unreasonable delay in condemning the property. The district court granted partial summary judgment for NDOT on Barsy's counterclaim.

A jury determined that just compensation for Barsy's property

amounted to $432,000 more than the amount originally offered by NDOT. The district court entered a judgment of condemnation in the amount awarded by the jury, plus an additional amount for prejudgment interest pursuant to NRS 37.175. The district court subsequently amended the prejudgment interest rate, finding that the statutory rate unreasonably compensated Barsy, and declaring the fair rate of prejudgment interest to be the prime rate plus two percent.

On appeal, NDOT argues that Barsy's challenge to the interest rate was untimely and that the district court's findings in its amended judgment are clearly erroneous. We disagree and affirm the district court's ruling.

On cross-appeal, Barsy argues that the district court erred in granting NDOT's motion for partial summary judgment.[1] We agree, reverse the partial summary judgment and remand the issue for trial.

## FACTS

On April 13, 1987, the Nevada State Senate passed Resolution No. 19 encouraging NDOT to proceed as quickly as possible to provide a full interchange at the intersection of Interstate 15 and Spring Mountain Road in Las Vegas. The resolution contemplated reliance on federal funding for ninety-five percent of the cost of the project.

In 1988, a design and alternatives were developed, and public input was solicited. Ultimately, NDOT decided to reconstruct the Spring Mountain Road interchange and to extend Desert Inn Road over I-15. An environmental assessment was also prepared in 1988 and provided to the Federal Highway Administration (FHWA) as a prerequisite to obtaining federal highway funds for the project.

Barsy owned property, with a building and two tenants, that would be affected by the project. In late 1988 or early 1989, a NDOT representative visited the two tenants, Decratrend Paints and Golden West Mechanical, informing them of the imminent project and of the relocation costs and benefits which NDOT would pay them. Due to NDOT's inability to indicate an accurate time frame for the acquisition of the property, the tenants refused to renew their leases upon expiration.[2] Barsy was unable to attract

---

[1]Barsy also seeks to appeal the district court's denial of his motion for partial summary judgment. However, an order denying summary judgment is not appealable. NRAP 3A(b); Evans v. Southwest Gas Corp., 108 Nev. 1002, 1003 n.1, 842 P.2d 719, 720 n. 1 (1992).

[2]Decratrend's lease expired December 31, 1990. Golden West's lease expired April 30, 1991.

new tenants because of the uncertainty surrounding the acquisition by NDOT.

In October 1989, a design for the new interchange and Desert Inn overpass was completed in time to allow NDOT to compete for certain federal funds. However, the funds were insufficient to complete the project. In order to compete for and acquire all necessary federal funding for acquisition and construction, and still meet the needs of the community by expediting construction, the project was divided into five stages. Each stage would provide significant transportation benefits independent of the other stages in the event funding for subsequent stages was delayed or denied. Construction of stage 1 started in the spring of 1991 and was completed in the fall of 1992. Barsy's property was scheduled to be acquired in 1993 or 1994 for stage 3.

Recognizing the inconvenience faced by Barsy and several of his neighbors, NDOT on three separate occasions from mid-1989 to early 1992, unsuccessfully sought federal funding for acquisition of those properties. In early 1991 and through the summer of 1992, Barsy requested that his property be acquired ahead of schedule because of the hardships he was suffering. Garth Dull, Director of NDOT, testified that since early 1991 he was aware of the inconvenience imposed on Barsy as a result of early project announcements, and sought to expedite acquisition of the property. In November 1991, Dull decided to obligate state highway funds, otherwise budgeted for highway maintenance, to appraise and prepare to acquire Barsy's property.[3]

In order to expedite the Barsy acquisition, and contrary to generally established NDOT procedure, NDOT contracted with Gary Kent on February 4, 1992 to perform the Barsy appraisal prior to receiving FHWA approval, thus risking the possibility of bearing the expense of the appraisal without FHWA reimbursement. On April 28, 1992, NDOT presented a written offer to Barsy to purchase his property for the appraised value of $1,455,000. Barsy rejected the offer.

On October 15, 1992, NDOT filed the underlying condemnation action, and deposited $1,455,000 with the district court on October 21, 1992. On October 15, 1993, Barsy filed a first amended counterclaim requesting that the court award Barsy lost rental income caused by the unreasonable delay in commencing the condemnation action.

On August 15, 1994, NDOT filed a motion for partial summary judgment on Barsy's claim for lost rents, and Barsy filed a countermotion for partial summary judgment. The district court

---

[3]Dull's decision accelerated the appraisal and acquisition of Barsy's property by approximately two years. NDOT risks state highway funds for right-of-way acquisition very infrequently.

granted NDOT's motion on September 9, 1994.[4] Barsy filed a notice of appeal on September 21, 1994.[5]

On September 15, 1994, the jury awarded Barsy $1,887,000 as just compensation for his property, valued as of October 20, 1992.[6] NDOT, having previously deposited $1,455,000 upon occupancy of the real property, owed a deficiency of $432,000.

Based upon the jury's verdict, the district court entered a judgment of condemnation on October 6, 1994, which included prejudgment interest at the rate provided in NRS 37.175.[7] Barsy filed two post-trial motions, claiming that the statutory interest rate was improper and asking that NRS 37.175(1) be declared unconstitutional as violative of the Equal Protection Clause of the Fourteenth Amendment. Alternatively, Barsy requested the district court to adopt an interest rate equal to the prime lending rate plus two percent, or to hold an evidentiary hearing to determine the proper rate of interest.

The district court rejected Barsy's equal protection argument,[8] and ordered an evidentiary hearing. At the latter hearing, both parties presented expert testimony regarding the proper rate of interest. On December 14, 1994, the district court filed an amended judgment of condemnation, in which it found that: 1) the rate provided in NRS 37.175 was unreasonable in compensating Barsy for the delay in payment of the difference between NDOT's initial deposit and the jury's valuation; and 2) "the fair rate of prejudgment interest is eight percent, computed by adding two percent to the prime rate which remained static at six percent from July 1, 1992 through January 1, 1994."

On appeal, NDOT argues that Barsy's challenge to the interest

---

[4]At a subsequent hearing on October 19, 1994, the district court requested the State's attorney to prepare findings of fact and conclusions of law and a judgment. Approximately two months later, the State's attorney prepared the document. By this time Judge Thompson had retired from the bench and the findings of fact and conclusions of law were signed by Judge Mosley.

[5]An amended notice of appeal was filed after the amended judgment, on December 19, 1994.

[6]NRS 37.120(1) sets the date of valuation as the date of the first service of summons.

[7]NRS 37.175 provides for prejudgment interest on condemnation judgments at the rate fixed for one year's United States Treasury bills adjusted and compounded annually.

[8]Barsy claims that "the district court did not rule on the constitutionality of NRS 37.175, but rather avoided the issue by making a factual determination as to what rate of interest would provide just compensation." However, the minutes of the hearing on November 30, 1994 state, "The Court disagrees with Mr. Waters' [Barsy's attorney] position on equal protection." And the December 5, 1994 minutes state, "Court stated it refused the equal protection argument."

rate was untimely and that the district court's two findings in its amended judgment are clearly erroneous. In his cross-appeal, Barsy insists that the district court erred in granting NDOT's motion for partial summary judgment.

## DISCUSSION

### A. NDOT'S APPEAL FROM AMENDED JUDGMENT OF CONDEMNATION

NDOT contends that the statutory rate operates as prima facie evidence of a fair rate. In County of Clark v. Alper, 100 Nev. 382, 685 P.2d 943 (1984), this court referred to the statutory rate as a *floor* on permissible rates, and allowed that legislative amendments increasing the statutory rate were prima facie proof of an *increase* in interest rates, not prima facie proof of a fair rate. This court further held that the determination of the proper interest rate is a question of fact, and that the district court was not bound by the statutory interest rate. *Id.* at 394, 685 P.2d at 951. We stated that just compensation requires that the landowner " 'be put in as good position pecuniarily as he would have been if his property had not been taken.' . . . The purpose of awarding interest is to compensate the landowner for the delay in the monetary payment that occurred after the property had been taken." *Id.* at 392, 685 P.2d at 950 (quoting Seaboard Air Line Ry. v. United States, 261 U.S. 299 (1923)). While the statutory rate should be used if unchallenged, once competent evidence is presented supporting another rate of interest as being more appropriate, the district judge must then determine which rate would permit the most reasonable interest rate.

Barsy's expert testified that a prudent landowner would have paid off the mortgage on the land or invested his money in land similar to that condemned rather than hold the land at such a low rate of return. He further testified:

> My opinion is that the . . . interest of prime plus two comes reasonably close to anticipating what property owners would have done with the money. The prime rate itself is a bank rate that is charged to a bank's best customer. Adding two percent for that allows for several things. One, a longer duration of the loan, which would be equivalent to the time it typically takes in one of these cases for the issue to be resolved, and two, also to allow for greater risk that's associated with an owner owning property particularly for business purposes.

We conclude that the evidence adduced on the subject substantially supported the district court's finding. *See* State Emp. Sec. v. Hilton Hotels, 102 Nev. 606, 608, 729 P.2d 497, 498 (1986) (substantial evidence is evidence which a reasonable mind might accept as adequate to support a conclusion).

NDOT next contends that Barsy's constitutional challenge to the statutory rate was untimely, and that Barsy's motion to amend based on NRCP 52(b) was inappropriate as a method to reopen the case to assert a new issue. We disagree. Barsy's motion alleged that the statutory rate was inapplicable for two reasons: 1) NRS 37.175 was unconstitutional; and 2) the statutory rate was unreasonable. The district court quickly rejected the constitutional claim, and the evidentiary hearing focused solely on the reasonableness claim. The district court eventually ruled only that the statutory rate was unreasonable.

NDOT cites no authority for the proposition that the challenge to the reasonableness of the interest rate was untimely, and gives no explanation as to why an NRCP 52(b) motion was inappropriate. This court need not consider assignments of error that are not supported by relevant legal authority. *See* Sheriff v. Gleave, 104 Nev. 496, 498, 761 P.2d 416, 418 (1988).

## B. *BARSY'S CROSS-APPEAL FROM ORDER GRANTING PARTIAL SUMMARY JUDGMENT*

Barsy contends that the district court erred in granting NDOT's motion for partial summary judgment. Summary judgment is proper only when no genuine issues of material fact remain for trial and the moving party is entitled to judgment as a matter of law. Perez v. Las Vegas Medical Ctr., 107 Nev. 1, 4, 805 P.2d 589, 590 (1991). Our review of summary judgment is de novo. Walker v. American Bankers Ins., 108 Nev. 533, 536, 836 P.2d 59, 61 (1992).

It is, of course, fundamental that property owners who suffer the loss of their property through condemnation proceedings are entitled to receive just compensation as provided under the "just compensation" clauses of the United States Constitution and, in the instant case, Article 1, section 8 of the Nevada Constitution. At issue in the case before us is whether the precondemnation activities of the State entitle Barsy to damages in addition to those resulting from the taking of his property. In resolving this issue, we elect to follow the leading case on the rights of property owners who sustain damages as a result of precondemnation

activities by the condemning authority. In the case of Klopping v. City of Whittier, 500 P.2d 1345, 1355 (Cal. 1972), the California Supreme Court, basing its decision on constitutional grounds, held that where a condemnor "acts unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct, our constitutional concern over property rights requires that the owner be compensated." The *Klopping* court ruled that a condemnee must demonstrate that the condemnor acted improperly following a precondemnation announcement by unreasonably delaying action or by other unreasonable precondemnation conduct and that such acts resulted in a decrease in the market value of the property. We define this cause of action to give a condemnee the right to recover for damages caused by precondemnation activity when extraordinary delay or oppressive conduct by the condemnor has been shown. The condemnation process involves governmental agencies and the court system, and it is endemic with delay. Without the reasonably stringent standard we adopt today, every condemnation case would give birth to a separate cause of action based on precondemnation activity. But where the evidentiary burden is met, the condemnee must be compensated for loss of income due to precondemnation action or publicity.

In applying this standard to the instant case, both parties erroneously treat as a question of law the issue of whether there has been any actionable delay by the condemnor. The courts have specifically recognized that the issue is a question of fact. *See id.* at 1357 ("whether there was unreasonable delay . . . is a question of fact"); Cambria Spring Co. v. City of Pico Rivera, 217 Cal. Rptr. 772, 782 (Ct. App. 1985) ("whether there has been unreasonable delay or unreasonable action by the condemnor is a question of fact . . . . [The] findings are entitled to be upheld if supported by substantial evidence").

For the landowner to state a cause of action, he also must allege facts showing an official action by the condemnor amounting to an announcement of intent to condemn. Terminals Equip. Co. v. County of San Francisco, 270 Cal. Rptr. 329, 336 (Ct. App. 1990). "The pivotal issue . . . is whether the public agency's activities have gone beyond the planning stage to reach the 'acquiring stage.' " *Id.* The public agency's activities reach the "acquiring stage" when condemnation has taken place, steps have been taken to commence eminent domain proceedings, or there has been an official act or expression of intent to condemn. *Id.* This requirement was followed by this court in Sproul Homes v. State ex rel. Dep't Hwys., 96 Nev. 441, 445, 611 P.2d 620,

622 (1980), in which the landowner's complaint was dismissed because there was "no factual allegation of undue or unreasonable delay."

Thus, the preliminary issue in the present case is whether Barsy has alleged facts showing an official act or expression by NDOT amounting to an announcement of an intent to condemn Barsy's land. We conclude that the record contains sufficient facts to make it inappropriate for summary judgment to have been granted on this preliminary issue. In late 1988 or early 1989, an NDOT representative personally visited Barsy's two tenants to inform them of an imminent condemnation and to explain the relocation benefits and costs which NDOT would pay. This early notice apparently resulted in the eventual loss of existing tenants and Barsy's inability to secure replacement tenants. As early as August 1989, NDOT had sought federal funds for a hardship acquisition of Barsy's property. NDOT sought such funds again in September 1990 and January 1992. NDOT explained that it sought the federal funding because it "recogniz[ed] the inconvenience faced by Mr. Barsy and several of his neighbors." Finally, in November 1991, NDOT risked state funds to appraise and acquire Barsy's property three to four years ahead of project construction needs.

NDOT's activities, described above, reflect a reasonable basis for concluding that NDOT felt at least partly responsible for Barsy's hardship. Moreover, these efforts could be viewed as evidencing NDOT's intent to purchase the property, moving beyond the planning stage to the acquiring stage. Therefore, the district court should have denied the State's motion for summary judgment, and this preliminary issue, as well as the issue whether there was extraordinary delay or oppressive conduct, should have been left for the jury to determine.

## CONCLUSION

For the reasons discussed above, we affirm the district court's order determining that the fair rate of interest was eight percent, but reverse the partial summary judgment against Barsy and remand the matter for trial on the issues of whether NDOT's official action amounted to an announcement to condemn and if preacquisition activity establishes extraordinary delay or oppressive conduct that would permit Barsy to recover damages he can prove.[9]

---

[9]THE HONORABLE A. WILLIAM MAUPIN, Justice, did not participate in the decision of this appeal.